# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: March 7, 2018

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | UNPUBLISHED |
| PATRICIA CROWDING, * | |
| * | No. 16-876V |
| Petitioner, * | |
| v. * | Special Master Gowen |
| * | |
| SECRETARY OF HEALTH * | Influenza Vaccine; Shoulder Injury; |
| AND HUMAN SERVICES, * | Amended Medical Records; |
| * | Dismissal; Failure to Prosecute; |
| Respondent. * | Failure to Comply with Court |
| * * * * * * * * * * * * * * * * * * | Orders. |

Maximillian J. Muller, Muller Brazil, LLP, for petitioner.
Ilene C. Albala, United States Department of Justice, Washington, DC for respondent.

### DISMISSAL DECISION[1]

On July 25, 2016, Patricia Crowding ("petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program,[2] alleging that as a result of receiving an influenza ("flu") vaccination in her left arm on September 23, 2014, she has suffered a left shoulder injury. On January 15, 2018, the undersigned issued an Order to Show Cause why this case should not be dismissed. The undersigned allowed petitioner until February 23, 2018, to comply with the order. The undersigned noted that petitioner's failure to respond to the order would result in dismissal of petitioner's claim. Petitioner has not responded.

Petitioner's claim is now **DISMISSED** for failure to prosecute and failure to comply with court orders, under Vaccine Rule 21(b)(1).

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), **because this unpublished decision contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.** The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. Before the decision is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version" of the ruling. *Id.* **If neither party files a motion for redaction within 14 days, the decision will be posted on the court's website without any changes.** *Id.*

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 *et seq.* (hereinafter "Vaccine Act" or "the Act"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

## I.   <u>Summary of Relevant Facts</u>

Upon receiving the flu vaccination on September 23, 2014, petitioner was a fifty-three-year old woman with a history of chronic severe lower back pain, hypertension, anxiety, asthma, hepatitis C, and gastric bypass. *See, e.g.*, Pet. Ex. 2 at 38. She smoked approximately half a pack of cigarettes each day. Pet. Ex. 2 at 54. She regularly sought care from her primary care physician, Dr. Azad Khan at A.K. Medical Associates, P.C. In the year before the vaccine, she saw Dr. Khan more than 15 times, most often following up about severe lower back pain and hypertension, and requesting refills on her medications. Pet. Ex. 2 at 23-38. Her pharmacy records indicate that in the year prior to the vaccine, petitioner filled prescriptions for a pain killer and a muscle relaxant approximately every two weeks. Pet. Ex. 1 at 1-2.[3]

On September 23, 2014, petitioner went to Dr. Khan. His contemporaneous medical record provides: "Pt came into the office for follow-up for severe lower back pain. Pt denies any new complaints at this time. Pt's blood pressure is wnl." Pet. Ex. 2 at 39. That same day, petitioner went to her local pharmacy. She refilled her prescriptions for the pain killer and the muscle relaxant. She also received the flu vaccine at issue. The pharmacy record does not indicate which arm the vaccination was given. Pet. Ex. 1 at 2.

On September 30, 2014, petitioner returned to Dr. Khan. As he did at the last visit, he recorded that petitioner was following up for severe lower back pain, she denied any new complaints at that time, and her blood pressure was within normal limits. Pet. Ex. 2 at 40.

At the next visit on October 7, 2014, Dr. Khan recorded that petitioner had back pain as well as an upper respiratory infection. Pet. Ex. 2 at 41. He prescribed an antibiotic and acetaminophen with codeine. Pet. Ex. 1 at 2.

On October 14, 2014, and October 21, 2014, Dr. Khan recorded that petitioner complained of back pain and denied any new complaints. Pet. Ex. 2 at 42-43.

On November 4, 2014, forty-two days after receiving the flu vaccine, petitioner returned to Dr. Khan. It provides: "pt came in the office with the complaint of ® [right] shoulder pain. Pt's blood pressure is within wnl." Dr. Khan referred petitioner to an orthopedic surgeon. Pet. Ex. 2 at 44.

On November 11, 2014, petitioner presented to orthopedic surgeon Dr. James Carey. He recorded that petitioner had been experiencing left shoulder pain since receiving a flu vaccine approximately six weeks prior. Petitioner said that at its worst, the pain was at approximately a 6 out of 10. The pain was associated with loss of motion. The symptoms were aggravated by reaching overhead and sleeping. An MRI showed "minimal glenohumeral joint osteoarthritis." Dr. Carey's assessment was that petitioner probably had adhesive capsulitis. He stated that her condition was likely in the first of three broad stages: freezing, frozen, and thawing. He discussed that adhesive capsulitis was often associated with diabetes mellitus and thyroid disorders. Within five minutes after a corticosteroid was administered, petitioner reported

---

[3] Dr. Khan is one of several prescribers listed. It is not clear whether the other prescribers are affiliated with Dr. Khan or with other practices.

substantial relief.  Dr. Carey prescribed Percocet, directed petitioner to do a series of at-home exercises, and planned to reevaluate in about 8 weeks.  Pet. Ex. 3 at 3-4.

On November 18, 2014, petitioner returned to Dr. Khan, who recorded that she was following up regarding severe lower back pain and that she denied any new complaints at that time.  There is no mention of shoulder pain.  Pet. Ex. 2 at 45.  On December 16, 2014, Dr. Khan made a basically identical record.  *Id*. at 46.

At another visit with Dr. Khan in December 2014,[4] petitioner complained of left shoulder pain.  He recorded that he would refer to an orthopedic surgeon.  Pet. Ex. 2 at 21.  On December 23, 2014, petitioner returned to Dr. Carey.  Petitioner reported her symptoms had improved approximately 25%.  The corticosteroid injection administered at their last visit on November 11, 2014, had provided partial relief of her symptoms for approximately one week.  Dr. Carey prescribed Oxycodone and planned to reevaluate in about 8-10 weeks.  Pet. Ex. 3 at 5-6.

On January 7 and January 14, 2015, petitioner went to Dr. Khan complaining of severe lower back pain.  Pet. Ex. 2 at 47, 22.  On January 20, 2015, petitioner went to Dr. Khan complaining of headaches and dizziness.  He recorded that she ran out of her blood pressure medication and that her blood pressure was elevated.  Pet. Ex. 2 at 20.

Also on January 20, 2015, petitioner was hospitalized.  For several days, she had been feeling increasingly anxious and was taking increased amounts of Xanax.  Her family members observed that she appeared more lethargic and drowsy, and took her to the hospital.  She was admitted overnight, given IV fluids, and discharged with instructions not to take more of the medication than was prescribed.  Pet. Ex. 2 at 49.

Dr. Carey's records provide that on March 3, 2015, petitioner's symptoms had improved approximately 40% but she still experienced pain at rest.  He prescribed Tramadol.  Pet. Ex. 3 at 7.  On May 5, 2015, her symptoms had improved approximately 50% but were "aggravated by sleeping."  He noted that petitioner's Percocet prescription had been discontinued.  He instructed petitioner to continue her at-home exercises.  Pet. Ex. 3 at 9-10.

From February – November 2015, petitioner went to Dr. Khan at least once per month.  On July 16, 2015, Dr. Khan recorded her complaint of left shoulder pain.  He observed positive tenderness over the left shoulder with decreased range of motion.  Dr. Khan directed her to follow up with pain management, which should obtain an MRI of the left shoulder.  Pet. Ex. 2 at 12.  Subsequent records primarily address other complaints, but reflect "a history of lower back pain and left shoulder pain."  Pet. Ex. 2 at 6, 8-9, 11.

---

[4] The record is dated December 30, 2014.  Pet. Ex. 2 at 21.  This may not be accurate, as the record also provides that Dr. Khan planned to refer petitioner to an orthopedic surgeon and petitioner in fact saw orthopedic surgeon Dr. Carey on December 23, 2014.  Pet. Ex. 3 at 5.

II.    **Procedural History**

On July 25, 2016, petitioner filed the petition, the records summarized above, and a Statement of Completion.  The claim was initially assigned to the Special Processing Unit ("SPU").

During the initial status conference on September 26, 2016, petitioner's counsel indicated petitioner did not specifically complain about her left shoulder to Dr. Khan before November 4, 2014, as indicated by the records.  The OSM staff attorney appearing on behalf of Chief Special Master Dorsey stated that petitioner many want to file an affidavit to provide additional details about why she did not specifically complain of shoulder pain at her multiple appointments with Dr. Khan between receiving the flu vaccine on September 23, 2014, and November 4, 2014.  Petitioner was directed to file any additional records or a status report indicating that no additional records existed.  Scheduling Order (ECF No. 7).

On December 12, 2016, petitioner filed an affidavit as suggested.  The affidavit states that she developed pain in her left shoulder "immediately following" the flu vaccine, which became "unbearable" within a week.  She states that she complained about the left shoulder pain since receiving the flu vaccine on September 30; October 7; October 14; and October 21.  She further states that over the course of those visits, Dr. Khan told her that it was not possible to have an injury from a flu shot; recommended applying ice and heat to the shoulder; and said the pain would resolve on its own.  She states that Dr. Khan discussed the possibility of seeing an orthopedic specialist on October 14 and he identified Dr. Carey on October 21.  Petitioner's Affidavit ("Pet. Aff.") at 1-2.

On December 12, 2016, petitioner filed a status report indicating that no further records existed in the case (ECF No. 11).  Petitioner filed a Statement of Completion on January 4, 2017 (ECF No. 14).  On January 11, 2017, respondent indicated a willingness to explore litigative risk settlement.  Status Report (ECF No. 15).  On February 22, 2017, respondent forwarded a settlement offer to petitioner.  Status Report (ECF No. 17).

On March 24, 2017, petitioner filed an additional exhibit, entitled "AK Medical Associates Updated Records."  Pet. Ex. 5.  The first page is a letter dated March 23, 2017, from the office manager at Dr. Khan's practice, A.K. Medical Associates PC.  The office manager writes that she is enclosing records that were "not part of the record send [sic] to you on June 29, 2016.  But this is now her [Patricia Crowding] complete records."  *Id.* at 1.  The letter is followed by medical records with dates from September 9, 2014 to December 16, 2014.  *Id.* at 2-10.  Also on March 24, 2017, petitioner filed a status report indicating that she had filed "additional" medical records and had responded to respondent's settlement offer.  Status Report (ECF No. 20).

On April 5, 2017, the OSM staff attorney convened a status conference.  She and the parties discussed that the "additional" medical records were in fact amended versions of the medical records from Dr. Khan's office, which were filed with the petition.  Order (ECF No. 23).  On April 11, 2017, respondent was authorized to subpoena AK Medical Associates P.C. depositions on this issue.  Respondent's Motion (ECF No. 24); Order (ECF No. 25).

The parties conducted depositions of Dr. Khan and the office manager on June 13, 2017, and respondent indicated his intent to defend the case on August 2, 2017.  Status Reports (ECF Nos. 28, 30).  On October 2, 2017, respondent filed his Rule 4(c) report, as well as transcripts of the depositions.  Respondent's Report (ECF No. 31); Resp. Exs. A, B.  On October 10, 2017, the case was transferred out of the SPU to the undersigned.

On November 14, 2017, the undersigned held his first status conference with the parties, during which they agreed to further review the record and reconvene.  During the next status conference on November 20, 2017, the undersigned and the parties had an extensive discussion.  The undersigned summarized that petitioner's claim involved multiple credibility issues, but it would be particularly difficult for petitioner to establish that the onset occurred within 48 hours of vaccination, as required for a Table SIRVA claim.  The undersigned directed petitioner to file a motion for a decision dismissing her claim or a status report proposing another course of action within 30 days, by December 20, 2017.  Order (ECF No. 37).

On December 20, 2017, petitioner instead filed a motion for an extension of time.  Petitioner's counsel had received her verbal consent to withdraw the claim, but had not yet received written authorization to do so.  Petitioner requested a further 30 days until January 19, 2018, which was granted.  Petitioner's Motion (ECF No. 38); Order (ECF No 39).

On January 16, 2018, petitioner filed a status report indicating that she had refused to allow counsel to withdraw her case and that she wished to seek new counsel.  Petitioner's counsel requested an extension for petitioner to do so, or in the alternative, a status conference to discuss the matter.

On January 23, 2018, the undersigned held a status conference, during which petitioner's counsel Mr. Max Muller appeared on her behalf.  Ms. Ilene Albala appeared on behalf of respondent.  Petitioner's counsel stated that he had made a good faith effort to represent petitioner and support her claim up to that point, but he did not wish to continue.  He offered to remain as petitioner's counsel of record for an additional 30 days, while petitioner pursued new counsel and decide how else to proceed.  Respondent did not object to this course of action.  During the status conference and in an Order to Show Cause entered on January 25, 2018, the undersigned noted that the difficulties with petitioner's claim.  The undersigned ordered petitioner to have new counsel enter an appearance or show other cause why her claim should not be dismissed for failure to prosecute within 30 days, by February 23, 2018.  The undersigned noted that failure to respond to the Order to Show Cause would result in dismissal of petitioner's claim.  Order to Show Cause (ECF No. 41).

Petitioner has not had new counsel enter an appearance in her case.  Petitioner has not made any further filings even though Mr. Muller has agreed to remain as her attorney of record during this time and he has the capability to file materials electronically on her behalf.  Neither petitioner nor Mr. Muller have contacted my chambers.  On February 28, 2018, my law clerk notified Mr. Muller (and respondent's counsel) that petitioner had missed the deadline to comply with the Order to Show Cause.  Mr. Muller did not respond.

### III.   Discussion

A petitioner must prove that she is entitled to compensation under the Vaccine Program. The burden of proof is by a preponderance of the evidence.  § 300aa-13(a)(1).  A petitioner may demonstrate entitlement in one of two ways.  The first way is to show that she suffered an injury listed on the Vaccine Injury Table, beginning within the requisite time period set forth on the Table (a "Table injury"), in which case, causation is presumed.  42 C.F.R. § 100.3.  When petitioner filed this claim on July 25, 2016, the Vaccine Injury Table did not list shoulder injuries related to vaccine administration ("SIRVA").  The final rule amending the Table was published on January 19, 2017, and took effect on March 21, 2017.  82 Fed. Reg. 6294 (Jan. 19, 2017) (to be codified at 42 C.F.R. Pt. 100).  Thus, petitioner is not entitled to a presumption of causation.

Instead, petitioner must show by preponderant evidence that her condition was caused-in-fact by the flu vaccine.  42 U.S.C. § 300aa-11(C)(1)(c)(ii).  She must prove by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."  *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

A key issue for petitioner to establish is the onset of her injury.  On this subject, while petitioner is not permitted to allege a Table SIRVA, that definition offers some probative weight. The Table provides that the acceptable time period for the onset of SIRVA following a flu vaccine is within 48 hours.  If petitioner established onset within this period and the other SIRVA requirements, the undersigned might recommend settlement.  And if the case proceeded on the litigation track, petitioner might be able to retain an expert supporting causation based on that close timing between the vaccine and her onset.

The Vaccine Act prohibits compensation based solely on petitioner's own allegations.  § 13(a)(1).  The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records, which are required to be filed with the petition.  §11(c)(2).  The Federal Circuit has made clear that medical records "warrant consideration as trustworthy evidence."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems), thus, they are generally afforded substantial weight. *Cucuras*, 993 F.2d at 1528.  Later testimony must be "must be consistent, clear, cogent, and compelling to outweigh medical records prepared for the purpose of diagnosis and treatment." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998).  A special master's decision to give greater weight to contemporaneous medical records than to other accounts, after evaluating all the evidence submitted, is reviewed under an abuse of discretion standard.  *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993)

In this case, petitioner alleges that she developed pain in her left shoulder "immediately following" the flu vaccine on September 23, 2014, which became "unbearable" within a week. She further alleges that she reported this pain to Dr. Khan on September 30; October 7; October 14; and October 21, 2014.  Pet. Aff. at 1-2.

However, petitioner has not supported those allegations.  The contemporaneous medical records suggest that petitioner did not complain of shoulder pain to Dr. Khan until November 4, 2014.  Pet. Ex. 2 at 40-43.

Further, on November 11, 2014, when the orthopedist Dr. Carey evaluated petitioner specifically for her shoulder symptoms, he wrote that the symptoms had been present "since receiving a flu shot about 6 weeks ago."  Pet. Ex. 3 at 3.  This appointment was actually 49 days - 7 weeks - after the flu vaccine.  While this record generally relates onset to the vaccine, it does not indicate that onset was "immediate" or within a particular number of hours or days afterwards.  Additionally, because this record was created later in time, it might merit less weight than the earlier records by Dr. Khan.

As noted in the Order to Show Cause, the "updated" records are entitled to little to no weight.  These are amended copies of the contemporaneous records from Dr. Khan's practice dated from September – December 2014.  The amended records are accompanied by a cover letter written by Dr. Khan's office manager and dated March 23, 2017, approximately two and a half years after the appointments in question.  During her deposition, the office manager testified that in early 2017, petitioner came into the office and indicated there was something wrong with her medical records because they did not mention her shoulder pain.  Resp. Ex. A at 37-38.  The office manager said that she recalled that in 2014, petitioner talked about the shoulder pain and the office manager said "sometimes your arms are still sore when you get the flu shots" but petitioner could tell Dr. Khan about that.  *Id.* at 36.  Petitioner "came back the next day" saying the shoulder wasn't feeling better and the office manager "let her see [Dr. Khan] again."  *Id.* at 37.

The office manager testified that in early 2017, she promised petitioner that she would look into the issue.  Afterwards, the office manager and a third-party typist changed the records.  The first record following the vaccine, on September 30, 2014, does not appear to be changed.  Pet. Ex. 5 at 4.  The records from October 7; October 14; and October 21 were changed to state that petitioner had received a flu shot in her right shoulder at a CVS pharmacy and that she was complaining of shoulder pain.  *Id.* at 5-7.  The record from November 4, 2014 was changed from mentioning shoulder pain for the first time, to petitioner "continu[ing] to complain that she is still having ® [right] shoulder pain."  *Id.* at 8.  The office manager testified that she told the typist what to change in the records, then she signed Dr. Khan's initials.  Resp. Ex. A at 41, 56.  She then faxed the amended records, with her cover letter, to petitioner's counsel.  *Id.* at 42-44.

The office manager testified that in changing the records, she "work[ed] off her memory" and "ad-libbed" certain details.  *Id.* at 41, 60, 70.  For example, because petitioner said she received the flu vaccine at a pharmacy and the office manager knew petitioner filled her prescriptions at CVS, the office manager assumed the flu vaccine was administered at CVS.  *Id.* at 60.  She also assumed that petitioner received the vaccine in her right shoulder.  *Id.* at 85.

During his deposition, Dr. Khan testified that he had not been practicing medicine since May 15, 2016, and he had no knowledge about petitioner's "updated" records.  Resp. Ex. B at 4:31 – 5:6.  Dr. Khan testified that he did not authorize the office manager to make those

changes.  *Id.* at 5:1 – 6:11.  Dr. Khan testified he would not recall what petitioner said to him at those appointments and "what's in the charts, that's it."  *Id.* at 6:4-7.

By her admission, the office manager amended the records and misrepresented them as the work of Dr. Khan, either at petitioner's request or in an effort to help her.  It is highly unlikely that the office manager has a clear, consistent, and credible memory of events that do not appear in the contemporaneous medical records and that happened several years ago. Additionally, the office manager guessed that the flu vaccine was administered at CVS and in petitioner's right arm (which is contrary to petitioner's allegations and Dr. Cary's records, about the left arm).  The office manager did not have firsthand knowledge of these details, and her assumption about the arm was incorrect.  Her tendency to guess at important facts makes her account less credible.

Even if the office manager did recall personally speaking with petitioner about shoulder symptoms occurring earlier than is reflected in the medical records, she was not specific about the timing.  She did not know when petitioner received the flu vaccine and did not relate petitioner's complaints to particular days or even months.

Furthermore, there is no evidence that the office manager observed and/ or heard petitioner's appointments with Dr. Khan.  Even if the office manager spoke with petitioner in the waiting room, she did not know what petitioner told Dr. Khan.  She was not authorized to change the medical records, and of course she is not a doctor herself.

I find that the office manager's "updated" records and her testimony are not sufficiently clear, cogent, and compelling to outweigh the contemporaneous medical records.  Petitioner has not established that she received the vaccine in her left arm or that her shoulder injury began within 48 hours, or another period of time that is temporally associated with the flu vaccine. *Cucuras*, 993 F.2d at 1528; *Camery*, 42 Fed. Cl. at 391.

Additionally, it is petitioner's obligation to follow court orders and non-compliance is not favorably considered.  Failure to follow court orders, as well as failure to file additional evidence to support a claim, may constitute a failure to prosecute, resulting in dismissal of petitioner's claim. *Tsekouras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 439 (1992), *aff'd* 991 F.2d 810 (Fed. Cir. 1993); *Sapharas v. Sec'y of Health & Human Servs.*, 35 Fed. Cl. 503 (1996); Vaccine Rule 21(b).  Petitioner has consistently failed to fulfill these obligations.  The Court first notified petitioner that the timing was an issue during the initial status conference in September 2016.  By August 2017, petitioner was aware that respondent took issue with the amended medical records and that respondent was opposed to compensation.  After the case was transferred in October 2017, the undersigned undertook a full review, agreed with the issues raised by the SPU and by respondent, and encouraged petitioner to voluntarily dismiss the case. The undersigned directed petitioner to file a response by December 20, 2017, which was extended to January 19, 2018, and then to February 23, 2018.  During this time, petitioner has been adequately represented by counsel.  Her counsel discussed these issues with petitioner, at one point obtained petitioner's verbal consent to dismiss the case, but could not obtain her written authorization.  Even after counsel informed the undersigned that he intended to withdraw from the case, he agreed to remain for an additional 30 days to allow petitioner to determine how to proceed.  The Order to

Show Cause entered on January 25, 2018, emphasized that if petitioner failed to respond, her case would be dismissed.

Despite these warnings and accommodations, petitioner has not offered any response to the Order to Show Cause.  Petitioner's repeated failure to meet court orders indicate a disinterest in pursuing her claim.  The undersigned will therefore dismiss the claim for failure to prosecute and failure to comply with court orders.

## IV.    Conclusion

Petitioner's claim is now **DISMISSED** for failure to prosecute and failure to comply with court orders, under Vaccine Rule 21(b)(1).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to **ENTER JUDGMENT** in accordance with this decision.[5]

**IT IS SO ORDERED.**

**s/ Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[5] Pursuant to Vaccine Rule 11(a), the entry of judgment is expedited by the parties jointly or separately filing notice renouncing their right to seek review.