# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: February 26, 2019

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | PUBLISHED |
| PATRICIA CROWDING, * | |
| * | No. 16-876V |
| Petitioner, * | |
| v. * | Special Master Gowen |
| * | |
| SECRETARY OF HEALTH * | Attorneys' Fees and Costs; |
| AND HUMAN SERVICES, * | Respondent's Objections to |
| * | Good Faith and Reasonable |
| Respondent. * | Basis; Amended Records. |
| * * * * * * * * * * * * * * * * * * | |

<u>Maximillian J. Muller</u>, Muller Brazil, LLP, for petitioner.
<u>Heather L. Pearlman</u>, United States Department of Justice, Washington, DC for respondent.[1]

## DECISION ON ATTORNEYS' FEES AND COSTS[2]

Now ripe for adjudication is Patricia Crowding ("petitioner")'s application for attorneys' fees and costs following dismissal of her petition in the National Vaccine Injury Compensation Program.[3] "Pet. App." (ECF No. 47). As detailed below, I find that the petition was filed with a reasonable basis and in good faith. However, petitioner and her counsel lost a presumption of good faith upon filing improperly amended medical records without investigating further or notifying the Court. That filing constituted at least a negligent misrepresentation to the Court and created a significant obstacle for the claim. Accordingly, petitioner will not be awarded attorneys' fees past that point.

---

[1] Ilene C. Albala was respondent's counsel of record throughout the litigation of this claim. She also submitted respondent's response contending that the claim did not possess good faith or reasonable basis. Afterwards, Heather C. Pearlman substituted as respondent's counsel on October 11, 2018. Notice of Appearance (ECF No. 49).

[2] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this decision contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims. The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. **This means the Ruling will be available to anyone with access to the Internet.** Before the decision is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." *Id*. **If neither party files a motion for redaction within 14 days, the decision will be posted on the court's website without any changes.** *Id.*

[3] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 *et seq.* (hereinafter "Vaccine Act" or "the Act"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

1

I.  **Underlying History**

   A.  **Original Medical Records**[4]

Upon receiving the flu vaccination on September 23, 2014, petitioner was a fifty-three-year old woman with a history of chronic severe lower back pain, hypertension, anxiety, asthma, hepatitis C, and gastric bypass. *See, e.g.*, Petitioner's Exhibit ("Pet. Ex.") 2 at 38. She smoked approximately half a pack of cigarettes each day. Pet. Ex. 2 at 54. She regularly sought care from her primary care physician, Dr. Azad Khan at A.K. Medical Associates, P.C. In the year before the vaccination, she saw Dr. Khan more than 15 times, most often following up about severe lower back pain and hypertension, while requesting refills on her medications. Pet. Ex. 2 at 23-38. Her pharmacy records indicate that in the year prior to the vaccination, petitioner filled prescriptions for a pain killer and a muscle relaxant approximately every two weeks. Pet. Ex. 1 at 1-2.[5]

On September 23, 2014, petitioner went to Dr. Khan. His contemporaneous medical record provides: "Pt came into the office for follow-up for severe lower back pain. Pt denies any new complaints at this time. Pt's blood pressure is wnl." Pet. Ex. 2 at 39. That same day, petitioner went to her local pharmacy. She refilled her prescriptions for the pain killer and the muscle relaxant. She also received the flu vaccine at issue. The pharmacy record does not indicate which arm the vaccination was given. Pet. Ex. 1 at 2.

On September 30, 2014, petitioner returned to Dr. Khan. As he did at the last visit, he recorded that petitioner was following up for severe lower back pain, she denied any new complaints at that time, and her blood pressure was within normal limits. Pet. Ex. 2 at 40.

At the next visit on October 7, 2014, Dr. Khan recorded that petitioner had back pain as well as an upper respiratory infection. Pet. Ex. 2 at 41. He prescribed an antibiotic and acetaminophen with codeine. Pet. Ex. 1 at 2.

On October 14 and 21, 2014, Dr. Khan recorded that petitioner complained of back pain and denied any new complaints. Pet. Ex. 2 at 42-43.

On November 4, 2014, forty-two days after receiving the flu vaccine, petitioner returned to Dr. Khan. His record provides: "pt came in the office with the complaint of ® [right] shoulder pain. Pt's blood pressure is within wnl." Dr. Khan referred petitioner to an orthopedic surgeon. Pet. Ex. 2 at 44.

On November 11, 2014, petitioner presented to orthopedic surgeon Dr. James Carey. He recorded that petitioner had been experiencing left shoulder pain since receiving a flu vaccine approximately six weeks prior. Petitioner said that at its worst, the pain was at approximately a 6

---

[4] This section is largely repeated from the decision dismissing the claim. *Crowding v. Sec'y of Health & Human Servs.*, No. 16-876V, 2018 WL 1835219, at *1-3 (Fed. Cl. Spec. Mstr. March 7, 2018).

[5] Dr. Khan is one of several prescribers listed. It is not clear whether the other prescribers are affiliated with Dr. Khan or with other practices.

out of 10.  The pain was associated with loss of motion.  The symptoms were aggravated by reaching overhead and sleeping. An MRI showed "minimal glenohumeral joint osteoarthritis." Dr. Carey's assessment was that petitioner probably had adhesive capsulitis.  He stated that her condition was likely in the first of three broad stages: freezing, frozen, and thawing. He discussed that adhesive capsulitis was often associated with diabetes mellitus and thyroid disorders.  Within five minutes after a corticosteroid was administered, petitioner reported substantial relief.  Dr. Carey prescribed Percocet, directed petitioner to do a series of at-home exercises, and planned to reevaluate in about 8 weeks.  Pet. Ex. 3 at 3-4.

Dr. Khan did not record shoulder pain at his next visits on November 18 or December 16, 2014.  Pet. Ex. 2 at 45-46.  However, at a different visit in December 2014,[6] he did record petitioner's complaint of shoulder pain and referred her again to Dr. Carey.  Pet. Ex. 2 at 21.  Dr. Carey continued to treat petitioner for shoulder pain through at least May 2015.  Pet. Ex. 3 at 5-10.  Dr. Khan recorded shoulder pain persisting to at least July 2015.  Pet. Ex. 2 at 12.

### B. Initial Procedural History[7]

On October 13, 2014, the attorney of record made his first billing entries for "review client intake" and "telephone call to client" about this claim.  Petitioner's Application for Attorneys' Fees and Costs ("Pet. App.") (ECF No. 45) at 4.[8]  Counsel communicated with petitioner multiple times and then "prepared correspondence to client re: 5 month letter" on March 24, 2015.  *Id.*  He followed up multiple times in 2015.  Then, on January 18, 2016, his paralegal requested medical records from the pharmacy, Dr. Khan, and Dr. Carey.  *Id.*[9]

On July 25, 2016, petitioner through her counsel filed her petition in the Vaccine Program, which alleged that as a result of receiving a flu vaccination in her left arm on September 23, 2014, she suffered a left shoulder injury.[10]  Petition (ECF No. 1).  The petition was accompanied by the records summarized above and a Statement of Completion.  The claim was initially assigned to the Special Processing Unit ("SPU").

---

[6] The record is dated December 30, 2014. Pet. Ex. 2 at 21.  This may not be accurate, as the record also provides that Dr. Khan planned to refer petitioner to an orthopedic surgeon and petitioner in fact saw orthopedic surgeon Dr. Carey on December 23, 2014. Pet. Ex. 3 at 5.

[7] This section is partially repeated from the decision dismissing the claim.  *Crowding*, 2018 WL 1835219, at *3-4.

[8] Counsel may have waited to pursue the case in light of the Vaccine Act's limitation to claims for vaccine injuries with (i) residual effects lasting more than six months or resulting in (ii) death or (iii) surgical intervention.  § 11(c)(1)(D).

[9] The undersigned notes that the billing records reveal that the attorney of record and one paralegal were the only people working on this claim from its inception to its end.  *See generally* Pet. App.

[10] As discussed below in the evaluation of reasonable basis, petitioner's claim was effectively for a shoulder injury related to vaccine administration (SIRVA), which is now listed on the Vaccine Injury Table within 48 hours of influenza vaccine.  However, the petition does not expressly use that term.  Additionally, the petition was filed prior to the final rule amending the Table was published and took into effect.  82 Fed. Reg. 6294 (Jan. 19, 2017) (to be codified at 42 C.F.R. § 100).

During the initial status conference on September 26, 2016, petitioner's counsel indicated petitioner did not specifically complain about her left shoulder to Dr. Khan before November 4, 2014, as indicated by the records. The OSM staff attorney appearing on behalf of Chief Special Master Dorsey stated that petitioner may want to file an affidavit to provide additional details about why she did not specifically complain of shoulder pain at her multiple appointments with Dr. Khan between receiving the flu vaccine on September 23, 2014, and November 4, 2014. Petitioner was directed to file any additional records or a status report indicating that no additional records existed. Scheduling Order (ECF No. 7).

On December 12, 2016, petitioner filed an affidavit as suggested. The affidavit states that she developed pain in her left shoulder "immediately following" the flu vaccine, which became "unbearable" within a week. She states that she complained about the left shoulder pain since receiving the flu vaccine on September 30; October 7; October 14; and October 21. She further states that over the course of those visits, Dr. Khan told her that it was not possible to have an injury from a flu shot; recommended applying ice and heat to the shoulder; and said the pain would resolve on its own. She states that Dr. Khan discussed the possibility of seeing an orthopedic specialist on October 14 and he identified Dr. Carey on October 21. Petitioner's Affidavit ("Pet. Aff.") at 1-2.

On December 12, 2016, petitioner filed a status report indicating that no further records existed in the case (ECF No. 11). Petitioner filed a Statement of Completion on January 4, 2017 (ECF No. 14).

On January 11, 2017, respondent indicated a willingness to explore litigative risk settlement. Status Report (ECF No. 15). Petitioner's counsel began drafting a demand. Then, on January 30, 2017, he and petitioner spoke on the telephone regarding a demand (0.3 hours). Pet. App. at 6.

Petitioner's counsel corresponded with respondent regarding a demand on February 14, 2017, and regarding an offer on February 15, 2017. *Id.* On February 22, 2017, petitioner's counsel notified the Court that petitioner was considering respondent's offer. Status Report (ECF No. 17).

On March 8, 2017, the paralegal had a telephone call with petitioner "re: status" (0.5 hours) and "prepare[d] updated medical record request to Dr. Azad Kahn" (0.4 hours). *Id.* Then, the paralegal sent and received correspondence from respondent's counsel regarding their offer and additional records (0.2 hours and 0.1 hours). *Id.* On March 22, 2017, the paralegal "review[ed] correspondence from Dr. Azad Kahn re: records" (0.2 hours) and "prepare[d] reply correspondence invoice" (0.2 hours). *Id.* On March 22, 2017, counsel "review[ed] updated records from Dr. Azad Kahn" (0.3 hours) and "revise[d] medical timeline" (0.2 hours). *Id.* On March 24, 2017, the paralegal prepared and filed the amended records as Exhibit 5 (0.2 hours and 0.2 hours). *Id.*

On March 24, 2017, petitioner, through her counsel, filed an additional exhibit entitled "AK Medical Associates Updated Records." Pet. Ex. 5. The first page is a letter dated March 23, 2017, from the office manager at Dr. Khan's practice. The office manager writes that she is

4

enclosing records that were "not part of the record send [sic] to you on June 29, 2016. But this is now her [Patricia Crowding] complete records." *Id.* at 1. The letter is followed by medical records which at first glance, appear to be authored by Dr. Khan, with dates from September 9, 2014 to December 16, 2014. *Id.* at 2-10. Also on March 24, 2017, petitioner filed a status report indicating that she had filed "additional" medical records and had responded to respondent's settlement offer. Status Report (ECF No. 20).

### C. Comparison of Original and Amended Records from Dr. Khan's Practice

Respondent provided an excellent summary of the key differences between the records from Dr. Khan's practice that were originally filed and the "additional," "amended," or "complete" medical records that were filed later:

> The "complete" medical records contradict petitioner's originally filed records. For example, while the originally filed medical records for October 7, 2014, state that petitioner complains of "cough and congestion", that her blood pressure is within normal limits, and that she experiences back pain, the "complete" medical records allegedly from that same date now add that petitioner experiences right shoulder pain, and that she received the flu shot in her right arm at CVS. *Compare* Pet. Ex. 2 at 41 *with* Pet. Ex. 5 at 5. The two records are also formatted differently—the original record has three initials on the page, one on the top left-hand corner, one on the bottom right and one on the bottom left, whereas the newly filed record only contains one set of initials on the bottom right-hand corner. *Id.*

> The discrepancies in medical records continue for petitioner's visits to Dr. Khan on October 14, October 21, and November 4, 2014. *Compare* Pet. Ex. 2 at 42-44 *with* Pet. Ex. 5 at 6-8. The narrative in the new record from October 14, 2014, is completely different than the original. The original narrative stated: "Pt came in the office for follow-up for Severe Lower Back Pain. Pt denies any new complaints at this time. Pt's blood pressure is elevated." Pet. Ex. 2 at 42. The updated medical narrative for the same date, now states: "Pt came for follow-up still complaining of Pain in ® Shoulder having discomfort when sleeping at night." Pet. Ex. 5 at 6.

> The narrative from October 21, 2014, is also markedly different. *Compare* Pet. Ex. 2 at 43 *with* Pet. Ex. 5 at 7. The more recently filed record adds in complaints of right shoulder pain and the comment "pt states she had never had a problem with flu before."

> The description of the events on November 4, 2014, is also different in the newly filed record. *Compare* Pet. Ex. 2 at 44 *with* Pet. Ex. 5 at 8. The medical record filed later by petitioner adds in the following language: "she continues to complain of that [sic] she is still having ® Shoulder Pain." *Id.* However, petitioner's newly filed medical record deletes the reference to the referral to an orthopedic surgeon. *See id.*

5

Rule 4(c) Report (ECF No. 31) at 6-7.  Respondent then provides, by way of example, copies of two medical records both allegedly pertaining to an appointment on October 7, 2014.  Rule 4(c) Report at 7-9 (comparing Pet. Ex. 2 at 41 (original record) with Pet. Ex. 5 at 5 (created in 2017)).  This appears to be a template, which lists the various body systems.  The original record, next to "Musculoskeletal," provides: "Pt. complains of back pain."  Pet. Ex. 2 at 41.  On the "additional" record for the same date, in the same place, it provides: "Pt. complains of lower back pain & shoulder pain with swelling."  Pet. Ex. 5 at 5.

### D. Depositions

After petitioner filed these amended records, respondent requested and the Court authorized depositions of the physician and the office manager.  In his deposition, Dr. Khan disclosed that he had not been practicing medicine since May 2016, he was awaiting criminal trial, and he could not testify further.  Respondent's ("Resp.") Ex. B at 4-6.[11]

In her deposition, the office manager described that after Dr. Khan's license was suspended, since approximately July 2016, she was the only employee present at the practice.  Resp. Ex. A at 13.  The practice had continued to pay her.  Her responsibilities included answering the phone, sending medical records to former patients' new physicians, and sending records to lawyers' offices.  *Id.* at 17.  The office manager recalled that in "early 2017", petitioner came into the office and stated that Dr. Khan's medical records did not properly record her shoulder pain.  *Id.* at 37 – 38.  Of note, petitioner also said that "the lawyers are trying to wrap everything up."  *Id.*  Petitioner did not offer anything to the office manager.  *Id.*  The office manager promised petitioner that she would look into the issue.  *Id.*

The office manager recalled that petitioner had complained about pain and swelling in her shoulder after receiving a flu vaccine.  *Id.* at 39-41.  The office manager, with a typist who also worked in the office, changed the records, "working off [their] memory" and "ad-lib[bing] certain details."  *Id.* at 41, 60, 70.  She also signed Dr. Khan's initials on the records, without telling him.  *Id.* at 56.  She then drafted a cover letter and faxed the records to petitioner's

---

[11] On May 11, 2016, the Department of Justice and the U.S. Attorney's Office for the Eastern District of Pennsylvania indicted Dr. Khan "in a scheme to sell commonly abused prescription drugs in exchange for cash payments.").  Department of Justice, *"Three Doctors Indicted for Illegally Selling Prescriptions of Suboxone and Klonopin,"* May 11, 2016, available at https://www.justice.gov/usao-edpa/pr/three-doctors-indicted-illegally-selling-prescriptions-suboxone-and-klonopin.  Dr. Khan was suspended from the practice of medicine on May 17, 2016.  *Pennsylvania Department of State – Licensing System Verification System*, available at https://www.pals.pa.gov/#/page/search (search for "Azad Khan" and license from State Board of Medicine, performed on January 29, 2019).  In July 2017, a jury convicted Dr. Khan of conspiracy and two counts of distributing drugs.  The Philadelphia Inquirer, *Jury Convicts South Philly doctor of conspiracy to sell opioids*, July 26, 2017, available at http://www.philly.com/philly/health/jury-convicts-south-philly-doc-of-conspiracy-to-sell-opioids-20170726.html.  The DOJ and Philadelphia Inquirer provide that Dr. Khan and the other defendants generally were not examining or counseling the patients but used template records and focused on prescribing drugs.

The undersigned notes that Dr. Khan's records for petitioner are very brief and utilize template forms.  However, petitioner did not fill prescriptions for the drugs at issue in Dr. Khan's criminal case.  Petitioner's affiliation with Dr. Khan was not fully litigated, as the claim was dismissed in large part due to the filing of records improperly amended by the office manager.

counsel. *Id.* at 53.

The office manager generally describes speaking with counsel, the paralegal, and/ or staff about "what happened." *Id.* at 88. After being contacted by the law firm (likely after the records were filed and to request that the office manager submit to a deposition), the office manager informed Dr. Khan of what she did. He said she shouldn't have done that and she should have got in touch with him first. *Id.* at 57. The office manager stated that she was just "trying to do the right thing, put – put what needed to be in her records, you know." *Id.* at 77 – 78.

### E. Subsequent Procedural History

After the depositions took place and respondent filed his Rule 4(c) report opposing compensation, the case was transferred to my docket. On November 14 and 20, 2017, I held status conferences[12] with both parties' counsel to discuss further proceedings and in particular, petitioner's filing of the amended records which appear to be an attempt – by petitioner and/ or the office manager – to fill in the gaps in the original records. Petitioner's counsel indicated that he believed that his client was credible. He requested a fact hearing. However, he was unable to articulate what a fact hearing would accomplish, particularly how it would explain the filing of amended records without appropriate disclosure of how, when, why and by whom the records had been amended. I encouraged petitioner and her counsel to file a motion for a decision dismissing her claim or a status report proposing another course of action. Order (ECF No. 37). Counsel initially obtained petitioner's verbal consent to dismiss the claim and was granted additional time to obtain written confirmation of the same. Petitioner's Motion (ECF No. 38); Order (ECF No. 39). Petitioner then refused to allow counsel to withdraw the claim. She wished to seek new counsel and the attorney of record wished to withdraw. Status Report (ECF No. 40). During a status conference on January 23, 2018, counsel indicated that he would stay on for an additional 30 days while petitioner sought new counsel and decided how else to proceed. I issued an order to show cause (ECF No. 41), which yielded no response from petitioner or her counsel. On March 7, 2018, the claim was dismissed for failure to prosecute and failure to comply with Court orders (ECF No. 42).

At issue now is petitioner's application for attorneys' fees and costs. Petitioner originally requested $17,557.50 in attorneys' fees and $452.78 in attorneys' costs, for a total request of $18,010.28. Pet. App. (ECF No. 47). Respondent opposes any award, contending that first, there was no reasonable basis for filing the claim, and second, petitioner lacked good faith when she later filed the amended medical records. Respondent's Response ("Resp. Response") (ECF No. 47). Petitioner has filed a reply for which she requests $1,595.00 in additional attorneys' fees. Pet. Reply (ECF No. 48). The matter is now ripe for adjudication.

## II.  Eligibility for Attorneys' Fees and Costs

When a petition does not result in compensation, a special master "may" award reasonable attorneys' fees and costs "if the special master determines that the petition was brought in good faith and there was a reasonable basis for which the petition was brought." §

---

[12] These status conferences were digitally recorded at respondent's request.

7

300aa-15(e)(1). The Federal Circuit has reasoned that in formulating this standard, Congress "intended to ensure that vaccine injury claimants have readily available a competent bar to prosecute their claims." *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d 1358, 1362 (Fed. Cir. 2012).

A special master may exercise his or her discretion in awarding attorneys' fees and costs. However, the decision may be reviewed to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1383-84 (Fed. Cir. 2011)).

"Reasonable basis" and "good faith" are two distinct requirements. *Simmons*, 875 F.3d at 635 (Fed. Cir. 2017) (citing *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 289 (2014)).

### A. Reasonable Basis

#### 1. Legal Standard

"Reasonable basis" is evaluated objectively. *Simmons*, 875 F.3d at 635, *Chuisano*, 116 Fed. Cl. at 289. This evaluation does not include consideration of the statute of limitations period or any directly related conduct by counsel. *Simmons*, 875 F.3d at 635, *Amankwaa*, 138 Fed. Cl. at 289. This evaluation may include various objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289-90 (citing *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018) ("[I]n deciding reasonable basis the Special Master needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery .... Under the objective standard articulated by the Federal Circuit in *Simmons*, the Special Master should have limited her review to the claim alleged in the petition to determine if it was feasible based on the materials submitted.")). A petitioner must furnish some evidence in support of the claim. *Bekiaris v. Sec'y of Health & Human Servs.*, 104 Fed. Cl. 108, *115 (Fed. Cl. Spec. Mstr. Sept. 25, 2018). For example, in *Chuisano*, the U.S. Court of Federal Claims held that a petitioner's statement plus temporal proximity was insufficient. The U.S. Court of Federal Claims suggested that additional sources of support would include medical records mentioning the vaccination; treating physicians' attribution of the injury to the vaccination; and expert opinion. *Chuisano*, 116 Fed. Cl. at 290.

Reasonable basis may exist at the time a claim is filed but dissipate as the case progresses. The Court of Federal Claims has noted that a special master may be required to "revisit[ ] the reasonable basis inquiry if it is warranted by changed circumstances during the proceedings." *Cottingham v. Sec'y of Health & Human Servs.*, 134 Fed. Cl. 567, 574 (2017), *see also Perreira*, 33 F.3d at 1376; *Curran v. Sec'y of Health & Human Servs.*, 130 Fed. Cl. 1, 6 (2017); *Allicock v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 724, 727 (2016).

8

### 2. Parties' Positions

Here, petitioner's application for attorneys' fees and costs does not address reasonable basis. *See generally* Pet. App.

In a response, respondent avers that petitioner has provided no credible evidence to satisfy the reasonable basis standard. Respondent avers: "According to the contemporaneous medical records, petitioner waited forty-two (42) days to mention any shoulder pain, and even then, the record is unclear as to which shoulder was impacted." Resp. Response at 5.

In a reply, petitioner's counsel avers that after he was contacted, he performed a thorough investigation which indicated there was a reasonable basis for filing the claim. Pet. Reply at 4. Specifically, petitioner herself personally recalled that on September 23, 2014, "immediately" after receiving a flu vaccine, she began to experience severe pain in her left shoulder. *Id.* Additionally and importantly, on November 11, 2014, an orthopedic specialist recorded her complaint of "shoulder pain since receiving a flu shot six weeks ago." *Id.* (citing Pet. Ex. 3 at 3). The records reflected that petitioner did receive the vaccine in question, that she had more than six months of pain, and that she was diagnosed with adhesive capsulitis of the shoulder. *Id.* at 5 - 6. The primary care physician Dr. Khan did not record shoulder pain at several appointments between September 23 – November 11, 2014. *Id.* at 6. However, counsel's pre-filing investigation revealed that Dr. Khan had been indicted and subsequently found guilty of distributing and conspiring to distribute controlled substances. *Id.* This "obviously called into question [the physician's] credibility and accuracy of the medical records." *Id.* However, petitioner was confident that she had complained of shoulder pain to the physician during these visits. *Id.*

Petitioner's counsel also avers that later in the case, the office manager who "unilaterally" amended the physician's records "substantiated petitioner's assertions." *Id.* Counsel avers that he has "overcome similar factual issues with fact hearings and affidavits." *Id.* at 6 – 8 (listing cases). Thus, petitioner and her counsel aver that there was "a reasonable basis to file this petition despite the ultimate dismissal of the claim." *Id.* at 8.

### 3. Discussion

Upon review, I find that there was reasonable basis to file the petition. There was also reasonable basis to proceed at least up to March 24, 2017.[13]

The petition seeks compensation for a left shoulder injury related to vaccine administration (SIRVA). The petition was filed on July 25, 2016, before SIRVA was added to the Vaccine Injury Table.[14] However, the Table and the accompanying Qualifications and Aids for Interpretation ("QAI") for SIRVA are helpful in evaluating pre-Table SIRVA claims. Based on my experience and understanding, there have been multiple occasions where the petitioner

---

[13] I will not discuss reasonable basis past that point because petitioner lost her presumption of good faith and is therefore ineligible for further attorneys' fees, as discussed further below.

[14] The final rule amending the Table was published on January 19, 2017. It governs claims filed on or after March 21, 2017. 82 Fed. Reg. 6294 (Jan. 19, 2017) (codified at 42 C.F.R. § 100.3).

filed a claim for SIRVA before that injury was added to the Table, but the petitioner established the Table SIRVA criteria and the parties reached an informal resolution.[15]

The Table creates a presumption of causation for certain SIRVA claims.  While not stated therein, a petitioner must first establish that he or she received the vaccine in the shoulder at issue.  Petitioner must also fulfill the following criteria:

   i.   No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, or diagnostic studies occurring after vaccine injection;
   ii.  Pain occurs within the specified time-frame *[per the Table, within 48 hours after vaccine administration]*;
   iii. Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
   iv.  No other condition or abnormality is present that would explain the patient's symptoms (*e.g.*, NCS/ EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any neuropathy.

42 C.F.R. § 100(b)(10).

Here, respondent's first objection to reasonable basis is that petitioner did not establish that she received the flu vaccine in her left shoulder.  Petitioner filed only a pharmacy prescription record of the vaccine on September 24, 2014, but this record does not indicate the site of administration.  Pet. Ex. 1 at 2.  On November 4, 2014, Dr. Khan recorded "® [presumably "right"] shoulder pain" without any reference to the flu vaccination.  Pet. Ex. 2 at 44.  According to news reports, Dr. Khan typically made cursory notes while prescribing controlled substances.[16]  Additionally, he typically handwrote those notes and afterwards had them transcribed into template documents by his staff.  It appears that Dr. Khan also followed these practices in the present case.  These are potential sources of error in his records.

In comparison, on November 11, 2014, the orthopedic surgeon Dr. Carey recorded that petitioner presented with left shoulder pain "since receiving a flu shot about 6 weeks ago."  Pet. Ex. 3 at 3.  It does not specifically say that she received the flu shot in the same shoulder, but petitioner clearly related the two events and it is reasonable to presume that it was in the same arm.  Dr. Carey's records appear competent, careful, thorough, and focused on treatment of the shoulder.  The petition and her affidavit also reflect petitioner's belief that the vaccination was in the left shoulder.  Thus, based on the available evidence, it is more likely than not that petitioner received the flu vaccine in her left shoulder.

Respondent's second objection to reasonable basis is that a petitioner must establish that onset is within forty-eight (48) hours of vaccination, but here, the first contemporaneous record of shoulder pain was forty-two (42) days after the vaccination.  That first record was by Dr.

---

[15] Indeed, a petitioner with an alleged onset less than three years after the Table change became effective – such as the petitioner here – could conceivably withdraw and then refile a petition to receive the benefit of the Table change.

[16] *See* DOJ press release and Philadelphia Inquirer article cited in footnote 11, *supra*.

Khan. Pet. Ex. 2 at 44. Petitioner submitted an affidavit acknowledging that Dr. Khan did not record shoulder pain at several intervening appointments. Pet. Ex. 4, referencing Pet. Ex. 2 at 38 – 43. She contends that she complained of shoulder pain at those intervening appointments, but her complaints were dismissed and not recorded by Dr. Khan. Pet. Ex. 4. I do not see any evidence of misrepresentation or bad faith in this affidavit. Additionally, on November 11, 2014, Dr. Carey recorded petitioner's complaint of "shoulder pain since receiving a flu shot about 6 weeks ago." Pet. Ex. 3 at 3. This appointment was actually 49 days – 7 weeks – after the flu vaccine. Although it does not indicate that onset was immediate or within a particular number of hours or days afterwards, it does relate onset to the vaccination. On this point as well, Dr. Carey's record is more likely to be accurate and supports reasonable basis, if not certain entitlement to compensation.

Additionally, Dr. Carey's record of petitioner's complaints, his physical exam, and the x-rays are largely consistent with SIRVA as defined in the Vaccine Injury Table. He did not record any inconsistent symptoms, findings, or diagnoses.

Often in the Vaccine Program, when a factual issue is disputed, a petitioner submits affidavits and/ or testimony from witnesses with their own personal recollections of the events in question. Here, petitioner's only proffered witness was the office manager. As an initial matter, I emphasize that the office manager should not have amended the medical records. Counsel could have worked with the office manager to prepare an affidavit and/ or testimony limited to her own personal recollections, such as of petitioner complaining to her, the office manager, about shoulder pain earlier than it was recorded in the medical records. If counsel and the office manager had done so, that might have provided support for petitioner's claim.

I cannot definitively conclude that petitioner would have prevailed if the claim was fully litigated. However, that is not the standard for reasonable basis. Rather, a special master needs to "focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a *feasible* claim for recovery." *Santacroce*, 2018 WL 405121, at *7 (emphasis added). Based on the totality of the circumstances, particularly the orthopedist's records describing a left shoulder injury within a close temporal relationship to the vaccine and describing findings consistent with SIRVA, I find that there was reasonable basis for filing this petition and pursuing it at least up to March 24, 2017, when the amended medical records were filed.

### B. Good Faith

#### 1. Legal Standard

In contrast to reasonable basis, "good faith" is a subjective standard. *Simmons*, 875 F.3d at 635, *Chuisano*, 116 Fed. Cl. at 289. It is not defined in the Vaccine Act, nor does there seem to be any helpful context in the legislative history. *See Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *4 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Thus, in *Turner*, former Chief Special Master Campbell-Smith referred to the plain meaning, definitions from legal dictionaries, and case law in understanding the term and applying it to the case before her.

Black's Law Dictionary defines good faith as "a state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty of obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or seek unconscionable advantage." *Black's Law Dictionary* (10th ed. 2014), accessed on Westlaw. The converse, bad faith, involves conduct indicating "dishonesty of belief, purpose, or motive." *Id.*

In the Vaccine Program, a petitioner is "entitled to a presumption of good faith as is the government." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). A special master is justified in presuming good faith "in the absence of direct evidence of bad faith." *Id.*

Petitioner should hold "an honest belief that a vaccine injury occurred." *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Past evaluations of petitioners' good faith have involved their knowledge that the alleged vaccine injuries had more likely alternative causes such as child abuse; their refusal of further vaccines; their communications with counsel and experts; and their conduct in prosecuting claims once they are filed. *Heath v. Sec'y of Health & Human Servs.*, No. 08-86V, 2011 WL 4433646 (Fed. Cl. Spec. Mstr. Aug. 25, 2011); *Moran v. Sec'y of Health & Human Servs.*, No. 07-363V, 2008 WL 8627380 (Fed. Cl. Spec. Mstr. Dec. 12, 2008); *O'Dell v. Sec'y of Health & Human Servs.*, No. 89-42V, 1991 WL 123581 (Fed. Cl. Spec. Mstr. June 19, 1991).

In one early case, Special Master Millman held that a *pro se* petitioner lacked good faith upon filing a claim accompanied by medical records with "obvious" alterations. *Carter v. Sec'y of Health & Human Servs.*, No. 90-3659V, 1996 WL 402033 (Fed. Cl. Spec. Mstr. July 3, 1996). Moreover, when an attorney later entered an appearance in that case, the attorney also acted in bad faith. The special master reasoned that counsel "had an obligation to review thoroughly the records." *Id.* at *3. Counsel should have recognized that there were several copies of the same records with "obvious" alterations and then inquired about the discrepancy. *Id.* The special master "did not conclude that [counsel] was aware of the forged medical records – only that he should have been aware." *Id.* at *4. The special master reasoned that by supporting the claim and not drawing attention to the altered records, counsel "represented to the Court that he believed the petition was filed in good faith and had a reasonable basis." *Id.* at *3.

More recent cases also suggest that counsel has a duty to investigate the claim. *See, e.g.*, *Simmons*, 875 F.3d at 636 ("an impending statute of limitations deadline may relate to whether 'the petition was brought in good faith' by counsel"), *see also Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018) ("the effort that an attorney makes to investigate a claim or to ensure that a claim is asserted before the expiration of the statutory limitations period . . . . are properly evaluated in determining whether a petition was brought in good faith"); *Cortez v. Sec'y of Health & Human Servs.*, No. 09-176V, 2014 WL 1604002, at *8 (Fed. Cl. Spec. Mstr. Mar. 26, 2014) ("Counsel still have a duty to investigate a Program claim even if they reasonably find their client to be a credible individual.").[17]

---

[17] But note that in *Cortez*, the special master held that a pre-filing investigation bore on whether there was reasonable basis for the claim. That does not align with the later binding precedent in *Simmons*, which suggests that counsel's conduct is more related to good faith.

The presumption of good faith may also be lost. The Federal Circuit has held: "when the reasonable basis that may have been sufficient to bring the claim ceases to exist, it cannot be said that the claim is maintained in good faith." *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994).

### 2. Parties' Positions

Here, petitioner's application for attorneys' fees and costs does not address good faith. *See generally* Pet. App.

In a response, respondent does not address whether the petition was *filed* in good faith. Rather, respondent asserts that "petitioner lacked good faith when she filed improperly 'doctored' medical records." Resp. Response at 6. Specifically, on March 24, 2017, petitioner through her counsel filed "altered versions of Dr. Khan's records for her visits from October 7 through November 4, 2014, which included new language of ongoing shoulder pain that was not included in the original records." Resp. Response at 7. Respondent contends that "petitioner's counsel could have and should have noticed these discrepancies and exercised appropriate diligence in investigating the source." *Id.* Respondent avers that awarding attorneys' fees in this instance would impede representation of the contemporaneous evidence and that a claim based on altered records is at best, frivolous. *Id.* Respondent avers that "the importance of protecting this Program from deceptive filings" is the key reason to deny attorneys' fees and costs in this case. *Id.* at 8.

Respondent also raises that Rule 11 of the U.S. Court of Federal Claims ("RCFC") may also bear on good faith. Specifically, Rule 11 provides that in making any filing with the Court, an attorney or unrepresented party "certifies to that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that "the factual contentions have evidentiary support or . . . . will likely have evidentiary support . . . ." Resp. Response at 6 (citing RCFC, Rule 11). Respondent cites *Judin*, in which the Federal Circuit provided that "Rule 11 is aimed at curbing baseless filings, which abuse the judicial system and burden courts and parties with needless expense and delay." *Judin v. U.S.*, 110 F.3d 780, 784 (Fed. Cir. 1997). Thus, a party must undertake an inquiry before making a filing with the Court, not after. In *Judin*, the Circuit held that both a plaintiff and counsel violated Rule 11 by failing to undertake a reasonable investigation before filing a patent infringement complaint. *Id.* at 784. Furthermore, counsel "acted unreasonably in giving blind deference to his client and assuming that his client had knowledge not disclosed to the attorney." *Id.* at 785. The Rule 11 violation was not cured by a later investigation which provided some support for the claim. *Id.* Respondent acknowledges that Rule 11 has not been applied in the context of the Vaccine Program but suggests that it is at least persuasive authority. Resp. Response at 6.

In a reply, petitioner insists that the petition was *filed* in good faith. She maintains her belief that she suffered a left shoulder injury related to administration of the flu vaccine. Her counsel adds that he interviewed petitioner and evaluated the record before concluding that the facts were sufficient to support a claim. Pet. Reply at 8. Petitioner and her counsel aver that respondent, in challenging good faith, "misrepresents the facts and places the blame on petitioner for the inadequate recordkeeping" of her physician. *Id.* However, petitioner and her counsel do not address the basis of respondent's objection: the later filing of "altered" medical record**s.**

13

### 3. Discussion

#### a. Filing of the Petition and Initial Proceedings

I find that petitioner acted in good faith upon filing the petition and in the early proceedings. As noted above, petitioner is entitled to a presumption of good faith. *Grice*, 36 Fed. Cl. at 121. Here, respondent does not argue that the original petition lacked good faith. Neither do I see reason for doing so. Neither the original petition or the accompanying records contain any clear alterations, misrepresentations, or other evidence that petitioner lacked good faith when she first filed her claim. After filing the petition, petitioner, through her counsel, acknowledged the issues that needed to be resolved while communicating with the Court. *See, e.g.*, Order (ECF No. 7). On December 12, 2016, she submitted an affidavit acknowledging that Dr. Khan's records did not reflect her recollections. Pet. Ex. 4. That same day, she filed a status report confirming that all relevant medical records had been filed. Status Report (ECF No. 11). This conduct in the early stage of the case also appears to be in good faith. Absent specific objection from respondent or other clear evidence to the contrary, I conclude that petitioner initially filed and pursued the claim in good faith.

#### b. Filing of Exhibit 5 on March 24, 2017 and Subsequent Proceedings

I find that petitioner lost the presumption of good faith upon filing the medical records amended by the office manager and that petitioner did not restore that presumption in the further proceedings. According to the office manager, petitioner visited Dr. Khan's former practice sometime in early 2017. It does not appear that petitioner had a medical reason for going there, as Dr. Khan was no longer in practice.[18] Thus, it appears likely, though not certain, that petitioner went to the practice seeking additional substantiation for her vaccine injury claim. In her affidavit, petitioner states that she was "shocked and upset" that Dr. Khan's records were not consistent with her recollections. Pet. Ex. 4 at ¶ 19. She was likely also frustrated that Dr. Khan's license was suspended and he was not available to address this issue. In Dr. Khan's absence, she complained to the office manager and stated that the lawyers were "trying to wrap everything up." Resp. Ex. A at 37-38. The available evidence at least suggests that petitioner asked the office manager to see whether the records could be amended. The office manager testified that she "would look to see what's going on and see if it's anything I can do." *Id.* at 38. The office manager also testified that she amended the records (without consulting Dr. Khan) *after* petitioner left the office. Thus, petitioner may or may not have known whether the records were amended by Dr. Khan or the office manager. That may bear on whether petitioner acted in good faith in bringing up the issue with those records. However, after the amended records came into controversy, petitioner did not participate in a deposition, appear before me in a status conference or hearing, submit a supplemental affidavit, or otherwise clarify her role in generating the amended records. Instead, after I communicated my concerns about the amended medical records, she refused to voluntarily dismiss her case and indicated that she would seek other counsel, but then failed to respond to an order to show cause, resulting in the dismissal of

---

[18] The office manager did say that Dr. Khan's brother-in-law continued to practice medicine, "sometimes" at the same location. Resp. Ex. A at 16. However, petitioner's records do not reflect any treatment by the brother-in-law.

her claim. Without an explanation from petitioner, I cannot find that she restored her presumption of good faith. *Compare to Moran*, 2008 WL 8627380, at *7-8 (holding that a petitioner did not act in good faith in part based on his "failure to take any action in support of his petition").

Here, *counsel's* conduct may be most relevant to the assessment of good faith. Counsel has a duty, and in fact, is presumed to *certify* to the Court, that he or she has "performed an inquiry reasonable under the circumstances" and has concluded that a filing on behalf of his or her client either has or will likely have "evidentiary support." RCFC Rule 11(b). Rule 11 violations have resulted in sanctions, but not in the context of the Vaccine Program. Nevertheless, I tend to agree with respondent that the policy expressed in Rule 11 is consistent with the notion that in the Vaccine Program, each party and their counsel has a responsibility to investigate their representations to the Court before filing. Resp. Response at 6, *citing Judin*, 110 F.3d at 784.

Additionally, case law in the Vaccine Program suggests that counsel's conduct can bear on whether a claim is brought and maintained in good faith. *Simmons*, 875 F.3d at 636 ("an impending statute of limitations deadline may relate to whether 'the petition was brought in good faith' *by counsel*") (emphasis added); *followed by Amankwaa*, 138 Fed. Cl. at 289 ("*the effort that an attorney makes* to investigate a claim or to ensure that a claim is asserted before the expiration of the statutory limitations period . . . . are properly evaluated in determining whether a petition was brought *in good faith"*) (emphasis added); *see also Cortez*, 2014 WL 1604002, at *8 ("Counsel still have a duty to investigate a Program claim even if they reasonably find their client to be a credible individual."); *Carter*, 1996 WL 402033, at *3-4 (holding that both a petitioner and their counsel acted in bad faith by not notifying the Court about forged medical records that had been filed). Indeed, in light of the *Simmons* holding that counsel's conduct cannot bear on the objective reasonable basis inquiry, counsel's conduct should logically fall under the subjective good faith inquiry.

In this case, the attorney of record (along with his paralegal and others at his firm) has significant experience in the Vaccine Program. By his admission, he "regularly litigates SIRVA cases." Pet. Reply at 6. He provides that he has previously encountered factual issues, such as where onset is not documented in contemporaneous medical records, which he overcame "with fact hearings and affidavits." *Id.* at 6-8 (summarizing four cases). My impression is that he has delivered adequate representation and successful results to many petitioners.

However, in this case, counsel's conduct fell short. His decision to file the records amended by the office manager – without further investigation, explanation, or context for the Court warrants criticism.

I agree with respondent that all petitioners' counsel should exercise diligence and care in their filing. There may be instances where it is not possible for counsel to quickly detect issues with a medical record's accuracy and authorship. But in this case, counsel was aware of the disciplinary and criminal proceedings against Dr. Khan "throughout the course of [counsel's] investigation of petitioner's claim." Pet. Reply at 6.

Additionally, there may be instances where counsel cannot readily evaluate whether they are about to file duplicative, possibly amended records. For example, a case may involve hundreds or thousands of pages of medical records, which do not directly bear on the key issues for adjudication. But in this case, counsel was aware that he had already filed Dr. Khan's full records for petitioner. Indeed, just four months prior, counsel represented to the Court that "Dr. Khan's office [ ] confirmed no updated medical records exist in this matter" and that "petitioner believes all relevant medical records have been had in this matter". Status Report filed December 12, 2016 (ECF No. 11). Additionally, counsel was aware that Dr. Khan's records did not fully corroborate petitioner's account of events. He had filed petitioner's supplemental affidavit addressing that issue. Pet. Ex. 4, filed December 12, 2016 (ECF No. 10).

During the status conference on November 20, 2017, counsel seemed to suggest that the "additional" records were not reviewed before they were filed. He stated "that was something we missed." This is incorrect. The billing entries reflect that both counsel and his paralegal reviewed the records before they were filed. *See* Pet. App. at 6. Thus, they both had the opportunity to notice that the "additional" records bore the same key dates as the records already filed as Exhibit 2. *Compare* Pet. Ex. 2 at 41 and Pet. Ex. 5 at 5 (both dated October 7, 2014); Pet. Ex. 2 at 42 and Pet. Ex. 5 at 6 (October 14); Pet. Ex. 2 at 43 and Pet. Ex. 5 at 7 (October 21); Pet. Ex. 2 at 44 and Pet. Ex. 5 at 8 (November 4). However, the "additional" records had changes that were more favorable to petitioner's vaccine injury claim. The "additional" records purportedly signed by a doctor who was no longer in practice should have raised a significant red flag and caused counsel to question their authorship. *Compare to Carter*, 1996 WL 402033 (holding that counsel should have recognized the similarities between original and later amended records, both filed by the petitioner while *pro se*).

Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), an individual "has the *right* to have a covered entity amend protected health information". 45 C.F.R. § 164.526(a)(1) (emphasis added). There are several valid grounds under which the covered entity can deny the request, including if the covered entity determines that the protected health information "is accurate and complete." § 164.526(a)(2)(iv). If the covered entity grants the request, it "must make the appropriate amendment . . . . by, *at a minimum, identifying the records in the designated record set that are affected by the amendment and appending or otherwise providing a link to the location of the amendment*". § 164.526(c)(1) (emphasis added). Thus, the covered entity must preserve the original record while making corrections or amendments to those records.

Within the Vaccine Program, contemporaneous medical records "warrant consideration as trustworthy evidence" and are presumed to be accurate and complete. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, a special master can find that contemporaneous medical records are outweighed by later testimony that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). If a medical provider later wishes to acknowledge that his or her records are inaccurate or missing certain details, there are appropriate means of doing so. I have seen records containing addenda signed by medical providers and dated after the original records were created. Those appeared to comply with the HIPAA regulation provided above. In other cases, medical providers have submitted affidavits and/ or live testimony providing that their personal recollections of details that they believe were incorrect or not provided in their contemporaneous

16

medical records. These procedures ensure that the evidence is represented accurately and with full context to the Court.

Here, it was not possible for petitioner to have Dr. Khan submit properly amended medical records or another account of his personal recollections as he was suspended from the practice of medicine and under criminal investigation. Counsel was aware of these facts.[19] Additionally, the "additional" records were prefaced by a cover letter signed by the office manager. Counsel should have known or at least suspected that the office manager was involved in amending the records. He also should have known or at least suspected that it was inappropriate for her to do so in light of her lack of medical training or involvement in petitioner's medical care.

Rather than simply filing the "additional" records, counsel should have investigated the issue. He could have promptly contacted the office manager. Counsel (through his paralegal) and the office manager were already in contact. Moreover, their offices were less than thirty (30) miles away.[20] Counsel could have arranged to meet with the office manager and helped her to prepare a careful and truthful affidavit recounting her personal recollections of petitioner's visits to Dr. Khan's practice in 2014, to be filed with the Court. That account may have been helpful to petitioner's claim (as it was in the previous SIRVA cases that counsel cites in his reply). Pet. Reply at 6-8. It certainly would have been a more accurate representation to the Court.

Instead, counsel filed records that were highly suspect, prefaced only by the office manager's cover letter stating that they were "not part of the original records send [sic] to you." Pet. Ex. 5 at 1. Upon filing these records, counsel represented to the Court that the records were either "additional" or were amended by a medical professional, when in fact they were not. This constituted at least a negligent misrepresentation to the Court.

Additionally, this filing was the impetus for all further proceedings in the case. Respondent withdrew from settlement discussions. Respondent shifted to a litigation posture, including requesting depositions which are highly unusual in the Vaccine Program. Following depositions of the office manager and Dr. Khan, the case was transferred out of the Special Processing Unit. I held several lengthy status conferences in which I expressed my own concerns about the amended medical records. In my view, counsel never satisfactorily explained why the amended medical records were filed. Counsel attempted but did not obtain petitioner's consent to withdraw the case. Petitioner then sought other counsel, but she apparently was not successful. She did not respond to an order to show cause, after which the case was dismissed. Thus, the filing of the "amended" medical records caused additional time and expense for the parties and for the Court. *See Judin v. U.S.*, 110 F.3d at 784 (noting that these unsupported filings can have these consequences). It also disturbed the presumption of good faith that is

---

[19] It does not appear that counsel formally disclosed this information to the Court before the "amended" records issue arose. It is not mentioned in the petition, petitioner's affidavit, or any other filings on the docket prior to March 24, 2017. This would only emphasize the importance of representing the "additional" records accurately to the Court.

[20] Driving directions from Muller Brazil LLP, 715 Twining Road, Dresher, PA, 19025 to A.K. Medical Associates, PC, 350 McDade Boulevard, Collingdale, PA 19023, entered at http://www.google.com/maps.

usually accorded to every party and their counsel, which was never satisfactorily restored.  Thus, I will not award attorneys' fees and costs incurred on or after March 24, 2017, when the "amended" records were filed.

### III. Reasonable Attorneys' Fees and Costs

#### A. Legal Standard

As stated above, the Vaccine Act only authorizes "reasonable" attorneys' fees and costs. The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera*, 515 F.3d at 1349.  Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347-58 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)).  Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings. *Id.* at 1348.  Although not explicitly stated in the statute, the requirement that only reasonable amounts be awarded applies to costs as well as to fees. *See Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

Special masters have "wide discretion in determining the reasonableness of both attorneys' fees and costs." *Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (1991). They may look to their experience and judgment to reduce the number of hours billed to a level they find reasonable for the work performed. *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993).  A line-by-line evaluation of the billing records is not required. *Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 483 (1991), *aff'd in relevant part*, 988 F.2d 131 (Fed. Cir. 1993 (per curiam).

The petitioner "bea[rs] the burden of establishing the hours expended, the rates charged, and the expenses incurred" are reasonable. *Wasson*, 24 Cl. Ct. at 484.  Adequate proof of the claimed fees and costs should be presented when the motion is filed. *Id.* at 484, n. 1.  Counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

#### B. Hourly Rates

The interim fee decision in *McCulloch* provides a framework for consideration of appropriate ranges for attorneys' fees based upon the experience of the practicing attorney. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).  The Court has since updated the *McCulloch* rates, and the Attorneys Forum Hourly Rate Fee Schedules for 2015-2016, 2017, and 2018 can be accessed online.[21]  The rates requested for the attorney and the paralegal billing on this case have previously been awarded in previous Vaccine Program cases by the undersigned and other Special Masters. *See,*

---

[21] United States Court of Federal Claims – OSM Attorneys' Forum Hourly Rate Fee Schedules, available at http://www.cofc.uscourts.gov/node/2914.

*.e.g.*, *Curry v. Sec'y of Health & Human Servs.*, No. 16-68V, 2018 WL 3991228, at *1 (Fed. Cl. Spec. Mstr. Jul. 10, 2018); *Lee v. Sec'y of Health & Human Servs.*, No. 15-823V, 2018 WL 4403970, at *1 (Fed. Cl. Spec. Mstr. Aug. 22, 2018). Accordingly, no adjustment to the requested rates is necessary.

### C.  Hours Expended

As previously noted, a line-by-line evaluation of the fee application is not required and will not be performed. *Wasson*, 24 Cl. Ct. at 484. Rather, I may rely on my experience to evaluate the reasonableness of hours expended. *Id.* Just as "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests …. [v]accine program special masters are also entitled to use their prior experience in reviewing fee applications." *Saxton*, 3 F.3d at 1521.

Here, counsel's billing records provide the date, detailed description(s) of the task(s) performed, the requested rate, and time expended. Paralegal tasks such as preparing documents for filing are appropriately billed at a paralegal rate. There do not appear to be entries for non-compensable administrative tasks. Therefore, consistent with my reasoning above, I will compensate work expended before March 24, 2017.

As discussed above, I have concluded that petitioner's March 24, 2017, filing of the amended records without proper investigation and without proper disclosure to the Court resulted in the loss of her good faith. Thus, I will not compensate any time expended on this case on or after March 24, 2017.

### D.  Attorneys' Fees for Reply Brief

In the reply, counsel requests $1,595.00 in attorneys' fees "incurred pertaining to research and preparation of the instant motion which was precipitated by respondent's counsel and/ or her client." Pet. Reply at 10. Counsel did not submit billing records or any information regarding which individual(s) prepared the reply, their requested rates, the hours expended, or the tasks involved. If the reply was prepared by the attorney of record at the 2018 rate of $300 per hour (provided in the application), it took him approximately 5.3 hours. This seems reasonable upon review of the reply. However, the reply does not provide any further detail about petitioner's interactions with the office manager and counsel's decision to file the amended records. Accordingly, in my discretion, I will reward 50% of the requested fees. This results in a reduction of $797.50.

### E.  Attorneys' Costs

Like attorneys' fees, a request for reimbursement of costs must be reasonable. *Perreira*, 27 Fed. Cl. 29, 34. Here, petitioner's counsel requests $452.78 in costs associated with obtaining medical records, filing the petition, and mailing the order to show cause and the dismissal decision to petitioner via certified mail. Pet. App. at 1, Ex. B. Based on my determination that petitioner lost her presumption of good faith and is not eligible for attorneys' fees from March 24, 2017 onward, the subsequent costs for mailing documents to petitioner will not be awarded. This results in a deduction of $13.34.

### III. Conclusion

In accordance with the foregoing, petitioner's application for attorneys' fees and costs is **GRANTED in part and DENIED in part**. I find that she is entitled to the following reasonable attorneys' fees and costs:

| | |
|---|---:|
| Attorneys' Fees Requested: | $19,152.50 |
| Reduction for Fees Beginning March 24, 2017 | - $8,987.50 |
| Reduction for Fees For the Reply Brief: | - $797.50 |
| **Attorneys' Fees Awarded:** | **$9,367.50** |
| | |
| Attorneys' Costs Requested: | $452.78 |
| Reduction for fees beginning March 24, 2017: | - $13.34 |
| **Attorneys' Costs Awarded:** | **$439.44** |
| | |
| **Total Attorneys' Fees and Costs Awarded:** | **$ 9,806.94** |

Accordingly, the following is awarded:

1) **A lump sum in the amount of $9,806.94, representing reimbursement for attorneys' fees and costs, in the form of a check payable jointly to petitioner and her counsel, Maximillian J. Muller, of Muller Brazil, LLP.**[22]

In the absence of a motion for reconsideration or review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment forthwith.[23]

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[22] These amounts are intended to cover all legal expenses incurred in this matter. This award encompasses all charges by the attorney against a client, "advanced costs," and fees for legal services rendered. Furthermore, Section 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein. *See generally Beck v. Sec'y of Health & Human Servs.*, 924 F.2d 1029 (Fed. Cir. 1991).

[23] Entry of judgment is expedited by each party's filing notice renouncing the right to seek review. Vaccine Rule 11(a).